May it please the Court. My name is Richard Tuttle. I'm counsel for David Marion, Federal Receiver For Bentley Financial Services, the plaintiff and appellant in this case. I would like to reserve three minutes for rebuttal. All right. Thank you. Thank you. Your Honors, in this case, plaintiff seeks recovery of amounts embezzled by Robert Bentley and others from property that was being held for investors by Bentley Financial Services. The claim is made under an insurance policy that says, quote Can you just make sure we understand what the facts are here, even though I was once involved with this case earlier? But the monies that would come in from the persons who thought they were buying CDs would go to whom and then to whom? They would go to either Bentley Financial Services or it would go to the Entrust custodial account. And Entrust is really doing business as? Entrust is Robert Bentley. Pardon me? Entrust is Robert Bentley. Correct. But it's our contention that the party soliciting the funds and gaining control over them and the liability to return them the minute they were tendered is the corporation, Bentley Financial Services. It's a little bit like if you are a warehouse man and you take in a package and you give it to your employee and say, here, this is perishable. Go home and put it in your refrigerator. The warehouse has still accepted the property, is still liable for its return. And where it happens to end up is a matter of no particular moment for purposes of the policy. Because the policy is real clear. It can be held by, and it's our contention it was held even in the Entrust account. Or it can be property for which the insured is legally liable. But this notion of what Entrust is vis-a-vis what BFS is, isn't it a fact that the investors knew they were sending the money to Entrust? They knew they were sending it to Entrust at BFS's instruction. That is, they dealt with BFS as the responsible party, the party that was making the commitment. We'll give you back your principal and interest. BFS was the legally liable and responsible party. Entrust, Mr. Bentley, was simply another responsible party, another custodian, another person to sue, if you will, who was also responsible for the return perhaps. But there's no question that BFS is the party that's primarily liable. Now, below you argued that there would be some right under the bond to recover in connection with essentially the fraudulent activity, the commitments that were made. I take it by your emphasis on embezzlement in your opening statement and in your briefs that you're only now talking, you've sort of abandoned that argument, that alternative argument. No, on the contrary. The policy is two-part, if you will, and I have to persuade you of two things. First, that there was a fraud and that it caused a loss. And then you look to another section of the policy, Section 10, that defines property more clearly. And it says, loss of property owned by the insured, held by the insured, or for which the insured is legally liable. To be sure, one of the elements of our proof is to prove the embezzlement. And here we did that. We presented evidence to the district court that there was $4.4 million embezzled from accounts of BFS. Let me stop you on that just so we can get facts. You can only include the amounts that were purportedly embezzled after the fidelity bond went into place. Is that correct? I haven't looked at that question, but yes, let's assume. I think that sounds logical. What's the number then? How much was pre-99, the 99 date that the bond went into effect? The best I can do on that, Your Honor, is to go back and calculate it and submit a letter to the panel answering the question. It's just too difficult to say. I mean, I don't need a precise number, but is it a substantial portion of the $4 million that you're talking about? It's very doubtful, and maybe my colleague will have a different answer. But the amounts involved here are so massive compared to the size of the policy. In the record shows payments of $222 million back to the class before this case got rolling. If you just prorated that amount over the period involved, a year's worth of embezzlement would only, from that kind of size of funds. The policy scheme started in 96. Right. And it was discovered, what, at 01, 02? Yes. And it would seem that anything that existed prior to the time of the fidelity bond in 99 is really not able to be counted as to a possible loss. That's right. And that's a good reason to send it back for further factual development. The district court decided this case too soon, at least in terms of granting summary judgment for the defendants. We know that there's an $18 net loss, because that was in the proof of loss. And $4.4 million of that was direct embezzlements for these commissions, the fraudulent commissions. Those numbers are orders of magnitude beyond what the $2 million would have been. Fraudulent commissions that Bentley took, is that what you're saying? That Bentley and his colleagues took, yes, from BFS accounts. You made a comment before about $22 million being paid out to the- $220 million. Being paid out to investors. You're not saying that that's part of the embezzlement. No. That was just to illustrate, it's actually $334 million, just to illustrate the kind of job the receiver has done here in amassing the assets and paying them back out to the claimants. The importance of those payments, and one that the district judge overlooked completely, is that establishes the legally liable. The district court talked about potential losses, as if these were theoretical claims, when in his record was evidence of $337 million of allowed claims, and $222 million already paid, and it's since gone up. There's nothing theoretical about the liability of BFS and the receiver standing in his shoes to these people who made these investments. The United States District Court has been proceeding under orders and assumptions that all of this property belongs to investors. This is a $2 million bond, and the max you can get is $1,990,000. Is that correct? That's correct, Your Honor. And it covers, in 99, BFS and Entrust, but the claim you filed was only on behalf of BFS. Is that correct? That's, I believe, correct, yes. I'd have to look at the proof of cost, but I believe that's correct. That's what we've been litigating at any rate. And so then the question becomes, what of the Ponzi scheme was either owned by, held by, or BFS was legally liable for? Correct. Is that what you're saying? Correct. And we know that there was a shortfall for which, a shortfall that could roughly correlate to the amounts that the defrauders withdrew from the scheme, and that's $18 million. So is your principal position that we need to send it back so that we can determine what's pre-'99 and what's post-'99? That's a suggestion that Judge Ambrose made, and I concur with it. I didn't say that. I just said that it seems like there's an exclusion that you need to take off the top. That was not an issue we litigated below. Okay. You keep talking about the embezzlement being from BFS, but your opponent argues that to the extent that there was embezzlement, it was of NTRUST funds, and that that amount cannot be covered. You haven't made a claim on behalf of NTRUST, and that it doesn't fall within what should be a covered loss. That's an acute factual dispute in this case. You will notice at page 112 of the joint appendix, the defendant in the court below conceded that the money came back to BFS before it was dispersed as commissions. They conceded that fact. Now, all of a sudden, on appeal, it's a big issue. The fact is Mr. Bentley testified. The proof of loss recounted. The defendants agreed that the money to fund the fraudulent commissions, that was the root, and they wrote these commission checks out of BFS. The precise amount of it. Let's go to the embezzlement. It looks like of the amount that was actually taken by Bentley from BFS was about $200,000, and the amount that was taken from NTRUST was about $1.5 million or so. On the contrary, Your Honor. Those were the amounts that we could readily identify from the documents that we assembled in the joint appendix. Let's go back to Judge O'Malley's question. Whatever the numbers are, and right now those are the numbers that we have, how do you justify saying that the monies he took from NTRUST, i.e. he took from himself, are embezzled monies? Because they are money that BFS controlled and simply gave to its employee. If one of these bonds... Are you sure BFS controlled it? Yes. How so? Because it was BFS as broker that negotiated the contract and said, we, BFS, will pay you back your money with interest. And as Your Honor described it, BFS issued a safekeeping receipt. That was the term you used in the TDI case. BFS was a custodian of these funds, and that's the whole foundation of the receivership action going on in District Court now. We know that BFS, of that roughly, whatever the number is, but let's say $1.5 million that came from NTRUST to Bentley, we know that BFS didn't own it. We know that BFS wasn't holding it, so the only argument... I don't agree with the not holding it for the reasons that I explained. But I know you're getting the legally liable, and yes, it's in the disjunctive, it's an or. Yeah, on the embezzlement part, I mean, you've got a, at least for the BFS portion of it, it looks like the $200,000 was taken from BFS that BFS certainly was holding. And probably was legally liable for, and I thought what you were saying is the district judge really didn't deal with that. All he dealt with was whether they owned it.  On the embezzlement part. That's correct. But that only gets you to roughly, as of the numbers we have today, about $200,000. The other number that we submitted to you was the 4.4, the $4.4 million that came out in commissions, because that's sworn evidence of record. But the 4.4 that came out in commissions, we don't know how much was actually done after the time of the Fidelity bond, the 99. That's correct. And we didn't want to mislead you with anything. The purpose of citing the checks themselves was our concrete way of saying, hey, this is real. The judge declared in the opinion below, BFS has only liabilities, no assets. And we're saying, judges, look, these are checks going out of the accounts. They're right in the appendix. That was the purpose of using those checks as examples. We'll hear from Mr. Phillips. Thank you, Your Honor. May it please the Court. I'm Bruce Phillips. I am counsel for Hartford Fire Insurance Company. The first thing I want to begin with, what I want to begin with, Your Honors, is the facts. It is important, as it was important to the receiver in the underlying litigation that resulted in the first appeal of this matter, or the appeal that was the TDI case, that there is a bright-line distinction between Bentley, the individual who is in trust, the sole proprietorship. Dumb question. What was Hartford's understanding of in-trust status when it actually issued the fidelity bond? The only honest answer I can give you on that, Your Honors, I don't know. The underwriter issue. I mean, it looks like somebody didn't do his or her due diligence. The whole question about the application that was submitted by Bentley, the application for the bond originally and the renewals, that's a separate issue that was before the district court on my motion for leave to amend because the applications were discovered way late in the evolution of this case. But on that point, Your Honor, it is equally important to emphasize that it is only under insuring agreement A that the receiver has filed its claim. Insuring agreement A is an agreement to indemnify for loss suffered by the insured. The insured on the proof of claim submitted by the receiver is BFS, the corporation. Contrary to opposing counsel's remarks in response to Judge Ambrose's question, the district court did not simply focus on the ownership issue. The district court mostly focused on the fact that the insured on whose behalf the receiver is making the claim. Well, I specifically was talking about BFS on the embezzlement point. It does look like there was, based on the current numbers that we have, 200,000 that was taken from BFS by Bentley for matters that were outside of his ordinary payments as an employee. On that point, Judge Ambrose, what the evidence established in the underlying litigation, the TDI litigation, as well as what was put before the district court was that all of the money, all of the funds that NTRUST or BFS ever held came from the investors as a result of the fraudulent conduct of Bentley. The monies originally went from the investors to NTRUST, the NTRUST account at Bryn Mawr Trust. Bentley testified in his certification of facts establishes that there were two separate accounts held at Bryn Mawr Trust. One was the NTRUST account. One was the BFS account. What Bentley would do when it suited his purpose to draw down money was he would have money transferred from the NTRUST account to the BFS account, and he would write checks against the BFS account for, quote, commissions. The amount of the money that he drew down in that manner is subject to some dispute, but the numbers are in. Are you talking about the embezzled monies or something else? Well, there were, it depends on, I'm talking about the monies that the investors paid over to NTRUST, and then Bentley caused NTRUST himself to transfer to BFS, and then BFS paid Bentley and others commissions. This presupposes that we agree with your argument that in order to be legally obligated to pay something, you had to have lawfully acquired it in the first instance, right?  I made the hypothetical before the district court, and if you'll permit me, I'll touch on it here. Hypothetical. On one given day on his way to work, Bentley stops off at his local branch of Wells Fargo and robs the bank, $2 million. And Bentley takes the $2 million and he puts it in a safe owned by BFS on BFS's premises. And then Bentley spends all the money out of the safe on BFS's premises. Now, at the time that the FBI discovers or the bank investigator discovers that Bentley did this, Bentley spent all the money. The receiver's theory is that the bank, or because BFS, the bank would sue BFS, that Hartford on the employee dishonesty bond would have liability to indemnify. Under your theory, the receiver's job should be really easy then, because then the receiver could say, look, claimants, BFS never had any legal obligation to pay you anything, so you don't have the ability to make a claim against this money. That doesn't seem to make sense. I mean, there's a lot in that fidelity bond that talks about transactions, whether they occur by fraud, whether it initially occurred by fraud or otherwise. The contemplation certainly is that there are many different mechanisms by which someone could become legally obligated to pay something. Only if there is first a loss incurred by the insured. Well, let me go to this. You seem, you and the district court are like two ships passing in the night. I mean, the district court had a very narrow basis for its holding, and that is that BFS had to have paid out some of its own money to claim its first before it could ever make a claim. You never seem to defend that holding in your briefing. You argue on this whole legally obligated to pay theory. Does that mean you don't endorse the district court's rationale? No, I absolutely endorse the district court's rationale. I mean, it's clear on its face, and it didn't need to be defended. Then why didn't you brief it? I'm sorry, Your Honor? Why didn't you brief any support for the district court's rationale? I believe that I did. I believe I touched on the correctness of the district court's rationale that there was no loss incurred by the named insured, BFS. But your explanation for why that is so is completely different from the district court's explanation. No, it's because the receiver switches horses. And on the appeal here, the receiver was focusing on the legal liability aspect of Section 10 of the bond, which is not an insuring agreement. It's a condition and limitation on the insuring agreement, A, which is the insuring agreement that the receiver is invoking here. An insuring agreement, A, is an indemnity agreement, an indemnity against loss. There has to be property that is lost for which the insured was legally responsible. And my argument was is that in order to be legally responsible for the property that was lost by dishonesty, you had to acquire that property honestly. Otherwise, the bond is being converted into an insurance policy against third-party liability. And the district court recognized that you can't convert simply by the phrase legal liability, you can't convert it into an insurance policy against third-party liability. Unless your honors have any further questions. Well, what is the effect of that both BFS and Entrust were named insureds under the bond? Then we have an imperi delicto problem as to whether, and I believe that's why the receiver did not claim on behalf of Entrust. Would be my guess. I have no further questions. Anything else? Thank you, Your Honor. Thank you. Mr. Tuttle. Two very brief points. The appellate in Hartford did not cite any cases, if you'll notice, in support of this proposition that wrongfully acquired monies cannot give rise to an insurable interest. You can be sure that if there were such a principle of law, there would have been a citation of authority to that effect. Well, you would agree at minimum that the fidelity bond wouldn't apply to, for instance, the false interest or false monies that were supposedly earned by these investors, correct? In other words, to the extent that the investor thought they were making money off of those CDs, that would be. I think that's right. That's a good point, that expectations are not property. Our claim and the proof of loss were based merely on the principle that was submitted, and we made that point in our brief. The other point is that we do cite two cases that are right on the money here. One is the Madoff case, the mass mutual case from the Delaware Chancery Court, which way down in the opinion gets to the point that where you have this legally liable language, it doesn't have to be an actual cash loss. And the Tenth Circuit in that non-precedential case, the Nelson case, is on all fours with this one. And obviously, we cite it under Rule 32.1 as persuasive authority. But it makes the point we're making, that this is an insurable interest. Thank you, Your Honors. Thank you both. We'll take the matter under advisement.